IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 4:21CR48 |
| v. | § | Judge Mazzant |
| | § | |
| SHANLIN JIN | § | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS

The United States of America hereby responds to and opposes Shanlin Jin's

motion to suppress statements he made to members of law enforcement on January 12,

2021 during the service of a search warrant at his residence.

## BACKGROUND

Over the course of many weeks at the end of 2020, multiple undercover agents and

officers downloaded child pornography from a user at an IP address resolving to Shanlin

Jin's Collin County residence.  ECF #1.  These downloads occurred on different dates

and times on a publicly available peer-to-peer file sharing platform.  *Id.*  Based on this

investigation, Lee McMillian, a Collin County Sheriff's Office Investigator, obtained a

search warrant for Jin's residence, which officers served on January 12, 2021.  *Id.*

McMillian interviewed Jin in his vehicle and recorded the session.[1]

During the approximately 32-minute interview, Jin and McMillian were seated in

---

[1] The camera saved the footage in 15-minute blocks.  Accordingly, part 1 is 15-minutes long
(CCSO0_000000202101121934754_0021.mp4); part 2 is 15-minutes long
(CCSO0_00000020210112195241_0022.mp4); and part 3 records Jin for approximately 2
minutes (CCSO0_0000002021011200742_0023.mp4).  These three parts appear to have been
renamed and produced to the Court as defense Exhibits A, C, and D.

the front seat of the vehicle.  Jin was unrestrained and at no point did McMillian touch him or encroach upon his personal space.  Almost immediately after beginning, McMillian provided Jin with his *Miranda* rights and asked whether Jin understood those rights.  Def. Ex. A, at ~00:08-1:00.  Jin responded "[y]eah."  *Id.*  McMillian then asked Jin "[w]ill you still talk with me?" to which Jin responded "sure" and "I don't know what this is about."  *Id.* at ~1:00.  Over the first 14-minutes of the interview, McMillian and Jin covered a wide variety of topics, with Jin providing information about his COVID status, personal identifiers, the spelling of his name, locations where he previously resided in the United States, the identities of the people living in the house, the location of his bedroom within the residence, and the utilities he was responsible for paying.  Def. Ex. A.

The topic of child pornography was not raised until approximately 14-minutes into the first recording.  Jin continued to engage with McMillian, even making the unprompted statement that a printout of child pornography "should be deleted immediately."  Def. Ex. C. at ~00:53.  When McMillian pressed on Jin's knowledge of child pornography, Jin maintained that he was not aware of a video playing on his computer and provided additional information about the websites he visited and the torrent files he downloaded.  At the end of the interview, McMillian advised Jin that he would need to remain outside of the house while the officers completed their search.  Def. Ex. D.  Jin is last seen exiting McMillian's vehicle and walking away.  *Id.*  At no time was Jin handcuffed, nor did he seek to end the interview.

On January 24, 2021, United States Magistrate Judge Christine A. Nowak, for the

Eastern District of Texas, signed a complaint and arrest warrant for Jin.  ECF #1.

Thereafter, a Grand Jury sitting in the Eastern District of Texas returned a three-count

indictment against Jin, charging violations of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1),

receipt and distribution of child pornography, respectively; and 18 U.S.C.

§§ 2252A(a)(5)(B) and (b)(2), possession of child pornography.  ECF #21.  Jin has

entered a not guilty plea to all counts.  ECF #23.

## ARGUMENT

### I.    Jin was not in custody during the January 12th interview

Jin's motion presupposes that the *Miranda* analysis applies as it begins with the

assertion that he was an "individual held for interrogation."  Jin Motion, p. 4.  However,

the government does not concede that the interview between McMillian and Jin on

January 12, 2021 constituted a "custodial interrogation."

Indeed, *Miranda* warnings are required only where an individual has been "taken

into custody or otherwise deprived of his freedom of action in any significant way."

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  It is well-settled that in order to

determine whether a defendant was "in custody" for purposes of *Miranda*, the Court must

consider whether (1) a "reasonable person would have felt he or she was not at liberty to

terminate the interrogation and leave," *and* (2) whether his "freedom of movement" was

curtailed to a degree associated with formal arrest.  *Howes v. Fields*, 565 U.S. 499, 509

(2012) (internal citations omitted); *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

Whether the defendant was in custody is an objective determination, which does not

depend upon the subjective views held by either the questioning officers or the person being questioned.  *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (*citing Stansbury v. California*, 511 U.S. 318, 323 (1994)).

Both the burden of production and burden of persuasion generally rest upon the movant in a suppression hearing.  *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986).  Here, Jin was not placed under arrest at the time of the interview, *see*, *e.g.*, *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988), so the Court must examine the "totality of the circumstances" in determining whether Jin was in custody.  *Behler*, 463 U.S. at 125.  The Fifth Circuit has identified factors that courts might consider in determining whether an individual is in custody for *Miranda* purposes, including: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by the officers regarding the individual's freedom to move or leave.  *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015).

These factors weigh against a finding that Jin was in McMillian's custody.  First, Jin and McMillian's entire interaction lasted approximately 32 minutes, the first half of which pertained almost exclusively to Jin's background, pedigree, and living situation. *Wright*, 777 F.3d at 771 (interview was approximately 1 hour); *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015) (interview 30 minutes long, most of which was inside a car).  Second, Jin spoke with McMillian in a car in the driveway of his own home.  *See*,

*e.g.*, *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996) (overruled on other grounds) (questioning in a defendant's home is "less coercive" than in a station house). Third, and as reflected in the video recording, the exchange was conversational, with give and take from both sides.  Indeed, Jin was an equal participant in the interview, including offering explanations and asking McMillian questions.  Moreover, McMillian wore a polo shirt and did not display his service weapon.  *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006).  Fourth, at no time was Jin ever handcuffed or physically restrained.  And fifth, McMillian ended the interview by explaining that the officers would be taking Jin's electronic devices and that Jin needed to remain outside of the house while the search was completed.  Jin agreed and did not ask to either reenter the house or leave the property.  *Cf. United States v. Cavazos,* 668 F.3d 190, 194-94 (5th Cir. 2012) (finding the defendant to have been "in custody" where he was handcuffed and his physical movements throughout his house were restrained).  Although officers later made the decision to arrest Jin, there was no discussion of an arrest nor conditions restraining Jin's movement to a degree indistinguishable from arrest during the time of the interview.

Based on the forgoing, the government respectfully asserts that there is no basis upon which to find that Jin was subject to a custodial interrogation.  Because Jin failed to make a prima facie showing, his motion should be denied.  *See*, *e.g.*, *De La Fuente*, 548 F.2d at 533 (the burden to demonstrate that a waiver comported with the requirements of *Miranda* shifts to the government after the defendant has established that he was subjected to a custodial interrogation).

## II.    Jin knowingly waived his Miranda rights

Should the Court conclude that Jin was subjected to a "custodial interrogation" for

purposes of the *Miranda* analysis, the parties agree on the standards of review.  That is, a

waiver is effective only where "made voluntarily, knowingly and intelligently."

*Miranda*, 384 U.S. at 444.  This determination requires a two-pronged analysis:

> First, the relinquishment of the right must have been voluntary in the sense
> that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being abandoned
> and the consequences of the decision to abandon it. Only if the "totality of
> the circumstances surrounding the interrogation" reveal both an uncoerced
> choice and the requisite level of comprehension may a court properly
> conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see also*, *United States v.*

*Collins*, 405 F.3d 95, 98 (5th Cir. 1994).

Jin does not appear to contend that he was subjected to "intimidation, coercion, or

deception."  Indeed, the video recording appended to Jin's Motion as exhibits A, C, and

D belies such an argument.  Jin and McMillian's exchange was professional and

measured.  And Jin disagreed with McMillian throughout, and held firm on his responses

even when McMillian questioned them or offered contradictory evidence.  *See*, *e.g.*,

*Moran*, 475 U.S. at 421-422 (noting the lack of "physical or psychological pressure

[exerted] to elicit the statements").

Jin thus appears to focus on the second prong; specifically, that Jin did not fully

comprehend the rights he was waiving because the interview was conducted in English.

Jin Motion, p. 1.  In support of his argument, Jin urges the Court to adopt the six factors

6

the Ninth Circuit enumerated in *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998), to evaluate whether a defendant "knowingly" waived their *Miranda* rights.  Jin Motion, pp. 6, 8-11.  However, the *Garibay* test stretches well-beyond Supreme Court precedent and, as Jin himself notes, has never been adopted by the Fifth Circuit.  Jin Motion, p. 7.

On its face, facts in *Garibay* are distinguishable from the case at bar.  Garibay was stopped while driving across the U.S.-Mexico border in a vehicle containing a large amount of marijuana.  143 F.3d at 536.  He was interviewed in a holding cell after his arrest.  *Id.*  Garibay was unable to speak more than a few words of English and his "IQ [wa]s borderline retarded."  *Id.* at 538.  Moreover, because there was no video footage of Garibay's interview, the Ninth Circuit relied solely upon the parties' conflicting statements about Garibay's comprehension of the *Miranda* rights.  *Id.* 538-539.  The video-recorded interview here paints a radically different picture.  Jin's English fluency, verbal comprehension, intellect, education (see below), and the circumstances surrounding his interview are markedly different than the situation presented in *Garibay*.

Case facts aside, Jin's reliance on *Garibay* invites the Court to impose an additional level of scrutiny—beyond the standard of the Fifth Circuit and many of its sister circuits.  The applicable test is whether the defendant's waiver was voluntary in light of the "totality of the circumstances."  *See*, *e.g.*, *United States v. Hernandez*, No. 14-119-SDD, 2015 WL 867930, *14 (M.D.La. Feb. 27, 2015) (*citing United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985)).  And "the controlling burden of proof at suppression

hearings should impose no greater burden than proof by preponderance of the evidence…." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (*quoting United States v. Matlock*, 415 U.S. 164, 178. n.14 (1974)); *see also*, *United States v. Garcia Abrego*, 141 F.3d 142, 171 (5th Cir. 1998).

In viewing the totality of the circumstances, the evidence before the Court demonstrates Jin's knowing waiver of his *Miranda* rights by a preponderance of the evidence.  It is undisputed that Jin is a citizen and national of the People's Republic of China and that English is not his first language.  ECF #12.  Yet there is no requirement that an individual primarily speak English in order to effectively waive their rights.  *See*, *e.g.*, *United States v. Khanalizadeh*, 493 F.3d 479, 484 (5th Cir. 2007) (defendant, an Iranian national, was able to speak English well enough to communicate with officers; his consent to search was voluntary); *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997); *United States v. Al Mosaadi*, 1:18CR192, 2020WL 6809259, *5 (W.D.N.Y. Aug. 10, 2020).  Indeed, "where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper." *Hernandez*, 2015 WL 867930 at *15 (*quoting United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir. 1990)).

Jin has visited the United States since he was 11 years old and moved to this country in 2016.  ECF #12.  He obtained a master's degree in Economics from Temple University in Philadelphia, Pennsylvania.  *Id*.  After obtaining that advanced degree, Jin

moved to Dallas, where he began a PhD program in Economics at Southern Methodist University.  Def. Ex. A.  Accordingly, Jin's engagement in the United States required him to ably speak and understand English.

Jin argues against his fluency by citing one instance in the interview in which he stated that he did not understand the meaning of the term "minimizing."[2]  Jin Motion, p. 10.  Similarly, Jin points to his statement that he had not "talked to people in English for a long time because of COVID."  *Id.*, p. 8.  However, the standard of comprehension does not require perfection.  *See, e.g.*, *United States v. Constantin*, 422 F.Supp.3d 1116, 1123 (M.D.La. 2019) (noting that the defendant spoke English "not unhaltingly, but well enough that he makes himself understood by [the officer], and well enough for the Court to understand his communication."); *United States v. Telez*, 586 F. App'x 242, 244-245 (7th Cir. Dec. 5, 2014); *United States v. Al-Cholan*, 610 F.3d 945, 254 (6th Cir. 2010). And when examined in context, Jin's statements demonstrate his thoughtful and careful deliberation.  For example, despite being engaged in a rigorous doctoral program through which he regularly used advanced economic computer modeling, Jin identified himself as only slightly better than average on computers—because one of his middle school peers was a computer genius and Jin was not at his level.  Def. Ex. A at ~6:35.

Similarly, when Jin did not understand McMillian, he stopped McMillan and asked for an explanation.  For example, during a discussion about intentional torrent

---

[2] Jin also argues that he also required an explanation for the English slang term "ton," Jin Motion, p. 10, however, the recording demonstrates that McMillian provided the explanation without any comment, request, or physical sign from Jin.  Def. Ex. C at ~10:52.

downloads, Jin asked McMillian to rephrase his question.  Def. Ex. A at ~13:18.

McMillian slowed down, rephrased the question, used the term "accident", and then

asked Jin to define the term to assess his comprehension.  *Id.*  Jin provided an articulate

and accurate explanation of an "accidental" download and the conversation proceeded

forward.[3]  The *Constantin* court viewed such a practice favorably and noted that such a

level of English proficiency would not be an "impediment to a valid waiver."

*Constantin*, 422 F.Supp.3d at 1123 (*citing United States v. Segovia-Ayala*, 14-CR-

00167(01), 2015 WL 745653, *6 (W.D.La. Feb. 18, 2015) (aff'd 648 F. App'x 403 (5th

Cir. May 12, 2016) ("On the few occasions when Defendant did not understand a

question, [the officer] rephrased the question, and the conversation continued.")).

   Jin is a highly intelligent, educated man who has lived continuously in the United

States since 2016.  While his English is accented, Jin and McMillian were able to easily

communicate over the course of the 30-minute interview.  Jin provided cogent, articulate,

and detailed responses to open-ended questions.  He occasionally sought clarification

from McMillian, but at no time did he evidence a lack of understanding of his rights or a

desire to end his interaction with McMillian.  Accordingly, he knowingly, voluntarily,

and intelligently waived his *Miranda* rights.

---

[3] Jin makes a generalized argument that "Chinese cultural norms" prompted his affirmative answers, suggesting that Jin simply agreed with McMillian out of cultural habit.  Jin Motion, p. 9.  The government asserts that such arguments are inappropriate here as there is no evidence or showing that Jin was comporting with his culture.  Simply because such responses have been observed in academic settings in no way establishes their presence here.  Moreover, the recording demonstrates that Jin's responses were not limited to nonconfrontational agreements.  Indeed, Jin provided lengthy statements and frequently disagreed with McMillian.

## **CONCLUSION**

For the reasons specified herein, Jin's motion to suppress statements he made to Investigator McMillian during a voluntary, non-custodial interview and based upon his voluntary, knowing, and intelligent waiver of his *Miranda* rights lacks merit and must be denied as a matter of law.

Respectfully submitted,

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY

/s/_____
MARISA J. MILLER
Assistant United States Attorney
New York Bar No. 4366415
101 East Park Boulevard, Suite 500
Plano, Texas 75074
(972) 509-1201
Marisa.Miller@usdoj.gov

## CERTIFICATE OF SERVICE

On October 15, 2021, I, Marisa J. Miller, Assistant U. S. Attorney for the Eastern District of Texas, do hereby certify that a true and correct copy of the foregoing instrument has been served on the following according to the Federal Rules of Criminal Procedure and the rules of this Court: Shaoming Cheng, Esq. and Paul Saputo, Esq.

/s/_____
Marisa J. Miller

11